# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DONALD SHERMAN,

     Plaintiff

v.

HAROLD WICKHAM, et al.,

     Defendants

Case No.: 3:21-cv-00168-ART-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 47

     This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Plaintiff's Renewed Motion for Preliminary Injunction. (ECF Nos. 47, 47-1 to 47-33.) Defendants filed a response (ECF Nos. 50, 51), and Plaintiff filed a reply (ECF No. 54). A hearing took place by videoconference on July 15, 2022, where the court heard argument from counsel and testimony was given by Nevada Department of Corrections (NDOC) Deputy Director Gittere and Ely State Prison (ESP) Warden Reubart. (ECF No. 55.) Defendants filed a supplement pursuant to the court's request. (ECF No. 59.)

     After a thorough review, it is recommended that Plaintiff's motion be granted in part.

## I. BACKGROUND

     Plaintiff is an inmate in the custody of the NDOC and initiated this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1(a). (Compl., ECF No. 6.) Plaintiff filed his original complaint pro se, but he has since obtained counsel. The parties stipulated to the filing of an amended

complaint that asserts claims under the First Amendment's Free Exercise Clause and RLUIPA. (ECF No. 57.)

Plaintiff is a twice convicted murderer who was sentenced to death in the State of Nevada, and he is housed in the Condemned Men's Unit (CMU) at Ely State Prison (ESP)—NDOC's maximum-security facility. Plaintiff is Native American and alleges he is being denied access to ESP's sweat lodge due to his CMU classification, and he is not allowed to possess specific traditional Native American foods for ceremonial purposes in violation of the First Amendment and RLUIPA. Defendants are Cooke, Drummond, Gittere, Reubart, Thomas, Wickham, Williams.

Plaintiff moves for injunctive relief only as to the RLUIPA sweat lodge claim. Specifically, Plaintiff seeks an order enjoining Defendants from enforcing their policies and regulations to the extent they deny Plaintiff access to the sweat lodge at ESP based on his CMU status.

## II. LEGAL STANDARD

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted). The instant

motion requires the court determine whether Plaintiff has established the following: (1) he is likely

to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.*

at 20 (citations omitted).

In addition, under the Prison Litigation Reform Act (PLRA), "[p]reliminary injunctive

relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds

requires preliminary relief, and be the least intrusive means necessary to correct that harm."

18 U.S.C. § 3626(a)(2).

### III. DISCUSSION

### A. RLUIPA

Under RLUIPA, the government cannot "impose a substantial burden on the religious

exercise" of an inmate unless it demonstrates that "imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means

of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

"The Supreme Court has recognized RLUIPA as...[a] 'congressional effort[] to accord

religious exercise heightened protection from government-imposed burdens[.]'" *Greene* v.

*Solano Cnty. Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S. 709,

714 (2005)). RLUIPA is "more generous to the religiously observant than the Free Exercise

Clause." *Jones v. Slade,* 23 F.4th 1124, 1139 (9th Cir. 2022) (citations omitted). "As such,

RLUIPA is to be 'construed broadly in favor of protecting an inmate's right to exercise his

religious  beliefs.'" *Id.* at 1140 (quoting *Warsoldier v. Woodford,* 418 F.3d 989, 995 (9th Cir.

2005)); *see also Johnson v. Baker,* 23 F.4th 1209, 1214 (9th Cir. 2022) (citation omitted).

However, "[c]ourts are expected to apply RLUIPA's standard with due deference to the

experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Hartmann v. Cal. Dep't of Corr.*, 707 F.3d 1114, 1124 (9th Cir. 2013) (internal quotation marks and citation omitted).

"Under RLUIPA, the challenging party bears the initial burden of proving that his religious exercise is grounded in a sincerely held religious belief ..., and that the government's action substantially burdens his religious exercise." *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015) (citations omitted); *see also Jones,* 23 F.4th at 1140; *Johnson,* 23 F.4th at 1214.

If the plaintiff makes a showing of a substantial burden on the exercise of his religion, the burden shifts to the defendant to establish that the burden on religious exercise furthers "a compelling governmental interest," and does so "by the least restrictive means." 42 U.S.C. § 2000cc-1(a), (b); *Holt,* 574 U.S. at 362 (citation omitted); *Jones,* 23 F.4th at 1141 (citations omitted); *Greene*, 513 F.3d at 988.

Defendants do not dispute that Plaintiff has a sincerely held belief that he must participate in the Native American sweat lodge ceremony. They likewise concede that banning him from engaging in this practice because of his CMU status substantially burdens his religious exercise. Therefore, in determining whether Plaintiff is likely to succeed on the merits of his RLUIPA claim, the court's inquiry will focus on whether Defendants have demonstrated that banning Plaintiff from accessing the sweat lodge furthers a compelling government interest, and that it does so by the least restrictive means.

**B. Exhaustion**

Preliminarily, Defendants argue that Plaintiff is not likely to succeed on the merits of his RLUIPA claim because he failed to exhaust his administrative remedies. Specifically,

1  Defendants contend that Plaintiff did not grieve the ability to utilize the sweat lodge on a regular

2  basis but only in connection with his execution.

3       The PLRA provides that "[n]o action shall be brought with respect to prison conditions

4  under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail,

5  prison, or other correctional facility until such administrative remedies as are available are

6  exhausted." 42 U.S.C. § 1997e(a). The failure to exhaust administrative remedies is "'an

7  affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166

8  (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007)).

9       "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper

10  exhaustion." *Jones*, 549 U.S. at 218. A grievance is sufficient "if it alerts the prison to the nature

11  of the wrong for which redress is sought." *Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010).

12  The grievance "need not include legal terminology or legal theories" as its "primary purpose …

13  is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for

14  litigation." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

15       Defendants do not provide evidence of NDOC's exhaustion requirements; however, the

16  court takes judicial notice of NDOC's Administrative Regulation (AR) 740, which requires an

17  inmate to proceed through three levels (informal, first, and second) to complete the grievance

18  process and exhaust administrative remedies.

19       Plaintiff completed grievance 20063076239 through all three levels. (ECF Nos. 47-18 to

20  47-23.) In the informal level grievance, Plaintiff said: "I am grieving RRT[1] denial of my request

21  to amend AR 810 to permit me access to sweat lodge. … Please allow me access to sweat

22  lodge." (ECF No. 47-18 at 2.) In his first level grievance he said: "My request to participate in

23

---

[1] "RRT" refers to NDOC's Religious Review Team.

sweat lodge ceremony is legitimate, reasonable and fundamental to my religion. … Please comply with the law and allow me access." (ECF No. 47-20 at 2.) His second level grievance asserted: "Attending sweat lodge ceremony is fundamental to my religious practice. …This is a violation of equal protection, First Amendment, and the RLUIPA. Please remedy. Amend AR 810 and allow me to sweat." (ECF No. 47-22 at 2.)

The grievance was not focused solely on Plaintiff's use of the sweat lodge prior to his execution, but requested generally that the AR be amended to allow Plaintiff—a Native American in the CMU—to utilize the sweat lodge. This is sufficient to put prison officials on notice of the nature of the wrong for which he sought redress. Therefore, Plaintiff exhausted administrative remedies for purposes of his RLUIPA claim, and this is not a basis to find Plaintiff is unlikely to succeed on the merits of this claim.

**C. Likelihood of Success on the Merits**

**1. Compelling Interests**

Defendants argue that safety, security, and operational concerns constitute compelling government interests that justify banning Plaintiff from accessing the sweat lodge.

Plaintiff argues Defendants' responses to his requests to use the sweat lodge do not reference these concerns, but instead, they are post-hac rationalizations invented after Plaintiff initiated this litigation.

"[E]xplanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations." *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014). "Only the true explanations for the policy count." *Id*. (citation omitted) (finding an issue of fact as to whether affidavits asserting

security concerns for the first time in litigation were the true explanation for the warden's decision to deny access to the sweat lodge); *see also Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014) ("such factually unsupported 'post-hac rationalizations' aren't the stuff of summary judgment victories in RLUIPA cases (or in most any other)").

Deputy Director Gittere testified at the hearing that these safety, security, and operational concerns were discussed with the RRT when Plaintiff's requests were denied. Therefore, the court will now address the specific safety, security, and operational concerns advanced by Defendants.

Defendants reference Plaintiff's custody status, the location of the sweat lodge, and his access to dangerous items within the sweat lodge as justification for banning Plaintiff from the sweat lodge.

ESP is the State's maximum custody prison facility. However, within ESP, there are different custody statuses, including maximum custody, close custody, medium custody, and minimum custody. Inmates may also be categorized to general population or segregation. General population is further categorized into different levels, with level 1 being the least restrictive category. CMU inmates can never be level 1 because of the nature of their incarceration. (Gittere Decl., ECF No. 51 at 49 ¶¶ 8-9.) CMU inmates must be in ankle and wrist restraints any time they are outside their unit. (*Id*. ¶ 12.) ESP grants access to the sweat lodge to inmates who fit the religious criteria and are classified as general population, close custody, level 1. According to Defendants, only these inmates are provided access to the sweat lodge because they pose the "least credible threat" to correctional staff and other inmates.

In addition, under ESP Operational Procedure (OP) 810, all CMU religious activities must take place within the CMU housing unit. The sweat lodge is in a designated fenced area

adjacent to the Phase II yard; therefore, CMU inmates do not have access to the sweat lodge. (ECF No. 47-8 at 4; ECF No. 47-10.)

Defendants assert that the sweat lodge is in an area known as "no man's land" between the exterior perimeter fence and the interior perimeter fence. The sweat lodge can be up to 10 feet in diameter, and may have two pits: one in the sweat lodge to hold the coals, and one outside the sweat lodge to heat up the coals and for worship fires. The pit in the sweat lodge can be up to 48 inches in diameter and 18 inches deep, while the pit outside the sweat lodge may be up to 60 inches in diameter and 18 inches deep. The sweat lodge may house up to 14 inmates at a time. Inmates use hot coals and other steam-producing items, and firewood can be stacked up to two feet high. Tools utilized in connection with the sweat lodge include a shovel, a metal garden rake, blankets, tarps, and ropes. While in the sweat lodge, the inmates are inaccessible to outside view. NDOC requires the chaplain to pass by the sweat lodge a minimum of once every hour to observe the area, and a correctional officer will also perform a visual security check every hour. (ECF No. 47-9 at 6, 26-28; ECF No. 47-10 at 2-4; Gittere Decl., ECF No. 51 at 48-50; Reubart Decl., ECF No. 51 at 64-66.)

There is no dispute there are obvious safety and security concerns when inmates housed at a maximum-security facility are provided access to fire, hot coals and rocks, firewood, ropes, blankets, shovels and rakes in an area where they are inaccessible to outside view. The problem with Defendants' argument, however, is that ESP—the State's maximum security prison facility—does in fact have a sweat lodge that is already accessible to general population, close custody, level 1 inmates. According to AR 521, close custody is the custody designation for the general population of a maximum-security facility such as ESP, and "is a restrictive level of supervision for inmates whose offense or institutional conduct indicates they represent a

potential for violence, escape, or disruption of institutional operations without controls inherent in close custody." (ECF No. 47-6 at 3-4.) That point bears repeating: ESP already lets inmates access the sweat lodge who have been classified as having the potential for violence, escape, or disruption.

In *Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014), a Native American inmate who was housed in a special protective unit sought access to the prison's sweat lodge, which was located in the general population prison yard. The Tenth Circuit rejected the prison's argument that the inherent danger of the sweat lodge was a compelling government interest that justified banning Yellowbear from the sweat lodge when the prison already had a sweat lodge, and there was no evidence of any problems with the operation of the sweat lodge with respect to the other inmates. *Yellowbear*, 741 F.3d at 58. Here, Defendants have similarly presented no evidence indicating any problems with the sweat lodge's operation with respect to the inmates that currently have access.

The court is not stating that once a prison offers a sweat lodge it must "forever maintain the lodge or provide unfettered access to it." *Id*. at 58. To do so, however, requires the prison point to *evidence* of a compelling government interest that justifies limiting or revoking that privilege. Moreover, Defendants must establish a compelling interest in the context of the burden on *Plaintiff* and not just generalized safety and security concerns. *See Yellowbear,* 741 F.3d at 57 ("inquiry proceeds in light of the particular burden the government has placed on the particular claimant before us").

Defendants argue that Plaintiff's CMU status itself justifies Plaintiff's ban from the sweat lodge. They point out that Plaintiff was sentenced to life in prison in Idaho for first degree murder in 1981, and was paroled after ten years and then absconded. While he was absconding,

he committed another murder for which he is currently incarcerated in Nevada. (ECF No. 51 at 89-91, 93.) There is no dispute Plaintiff is a twice-convicted murderer facing a death sentence. However, Defendants acknowledge there are 23 inmates at ESP who have a conviction of murder who have a classification of general population, close custody, level 1, such that they could access the sweat lodge if they otherwise met the religious requirements. (ECF No. 59.) Defendants attempt to distinguish Plaintiff from these inmates, by arguing that they have worked for their classification status over a period of time; however, as will be discussed below, Plaintiff also presents evidence that he has been an exemplary inmate within ESP, but he could never obtain level 1 status because of his sentence. Defendants contend that Plaintiff's death sentence means he has nothing to lose in terms of attempting to escape or harming staff or other inmates. However, a general population, close custody, level 1 inmate who is convicted of murder with a sentence of life without the possibility of parole is similarly situated.

Defendants argue Plaintiff's violent past and his disciplinary history within NDOC are also reasons that Plaintiff should not be allowed access to the sweat lodge. First, they point to a record from Clark County Detention Center (CCDC), where Plaintiff was housed prior to being moved to NDOC, which states that Plaintiff "would seriously harm or kill a staff member to aid his escape" and that he was "an extremely violent offender" who "requires maximum security at ESP." (ECF No. 51 at 93-94.) As Plaintiff notes, the statement from CCDC was made some 25 years ago, and is not necessarily reflective of any risk to safety and security Plaintiff poses now.

Second, Defendants submit a disciplinary finding of possession of unauthorized letters (one contained a recipe for methamphetamine). (ECF No. 51 at 96.) This offense was from 21 years ago, and there are no details about the offense other than the description of the charge.

1    Finally, Defendants offer two other disciplinary charges within NDOC for fighting and

2    battery and for threats (described as being verbally abusive). (ECF No. 51 at 98-102.) Both of

3    these charges were dismissed, and therefore, are not probative of Plaintiff's violent history.

4    As was alluded to above, Defendants do not dispute Plaintiff's evidence that he enjoys

5    full privileges within the CMU, he has no demonstrated risk of violence or escape while in

6    NDOC, he has served as the CMU unit barber, and he has been a member of the Inmate

7    Advisory Committee for CMU prisoners. (Pl. Decl., ECF No. 47-1 at 3-4 ¶¶ 5-10.)

8    Defendants also argue that Plaintiff's ban from the sweat lodge is justified because if the

9    requested relief is granted there will be a substantial impact on ESP operations. First, they assert

10    that every Correctional Emergency Response Team (CERT) member on shift will be required to

11    assist with Plaintiff's access to the sweat lodge. As a result, these CERT team members will not

12    be available for any of their other required duties and CERT members will have to be brought in

13    on overtime to cover the gap. Second, they maintain that an additional officer would be required

14    to man the closest tower to provide security overwatch. Third, they contend the chaplain would

15    be required to attend the sweat lodge for the entire period Plaintiff participates, placing a strain

16    on other religious operations.

17    ESP Warden Reubart bases the determination that all CERT members would be required

18    to accompany Plaintiff to the sweat lodge on: (1) "significant experience working in

19    corrections;" (2) the existing AR "pertaining to the transport of maximum custody inmates

20    outside of the institution;" and (3) the "high-risk potential for escape" due to Plaintiff's sentence.

21    (ECF No. 51 at 65-66 ¶ 9.)

22    At the hearing, there was testimony that the CERT team is not utilized at all when non-

23    CMU inmates access the sweat lodge, though they are within 100 yards and can conduct "spot

1  checks." No specific explanation has been given, however, as to why every CERT member

2  would be required to assist with a CMU inmate accessing the sweat lodge. Warden Reubart

3  references the AR pertaining to transport of a maximum custody inmate *outside* the institution,

4  but accessing the sweat lodge would occur *inside* ESP, such that the cited AR has no impact

5  here.

6          Insofar as the risk of escape is concerned, the photographs of the sweat lodge grounds

7  submitted by Plaintiff demonstrate that the sweat lodge is contained within a fenced perimeter

8  surrounded by barbed wire on the top. The sweat lodge perimeter is, in turn, surrounded by

9  another taller fence that also has barbed wire on the top, and there is a gun tower nearby. (ECF

10  No. 47-12.) Defendants have not explained with any specificity the risk of escape under these

11  conditions, and to the extent such a risk exists, it seems to apply equally to other inmates who are

12  allowed to access the sweat lodge.

13          Nor do Defendants ever explain why an additional officer would be required in the tower,

14  or why the chaplain would be required to attend the entire time when the procedures currently

15  require the chaplain only check in at least once an hour.

16          Next, according to Defendants, if Plaintiff is allowed to access the sweat lodge, the prison

17  must "lock down" the use of the main recreation yard in that unit for the entire period Plaintiff is

18  out of the CMU. This is because the sweat lodge shares a fence with the main recreation yard

19  and current procedures do not permit contact between CMU inmates and general population

20  inmates. (Reubart Decl., ECF No. 51 at 64-66.)

21          Defendants acknowledged at the hearing that this same lock down protocol is utilized if a

22  CMU inmate has to be taken to a medical or other appointment outside of the CMU unit. There

23

1   is no evidence in the record how often this occurs, but with 54 inmates on death row, it has to

2   occur with some frequency.

3          In *Yellowbear*, the prison also argued the ban on access to the sweat lodge was warranted

4   because transporting Yellowbear between his protective custody unit and the sweat lodge would

5   require the prison to place the facility on lock down so that Yellowbear would not be in contact

6   with non-protective custody inmates. *Yellowbear*, 741 F.3d at 58-59. Yellowbear presented

7   evidence that such lock downs occurred on a daily basis to transport "specially housed" inmates

8   to other parts of the prison, such as the medical department. The Tenth Circuit posed this

9   question: "If lock downs can be accomplished on a *daily* basis consistent with the prison's

10  administrative concerns to facilitate inmates' *medical* needs, what compelling interest is served

11  by refusing any lock downs *ever* to facilitate an inmate's *religious* needs?" *Id*. at 60 (emphasis

12  original). In other words, "why is this religious exemption offensive to the prison's putatively

13  compelling no-lock-down interest when other secular exemptions are not?" *Id*. This can raise

14  "the inference that the government's claimed interest isn't actually so compelling after all." *Id*.

15         The Tenth Circuit explained the prison could rebut this inference, for example, by

16  providing evidence that "the prison's resources are already stretched thin by lock downs for

17  prisoner's medical needs, and … any further lock down would be the proverbial straw,

18  overwhelming the prison's resources[.]" *Id*. at 61. They could also point to evidence that the

19  resources needed to facilitate a lock down so an inmate could access the sweat lodge would

20  "require considerably more personnel for longer periods than lock downs needed to facilitate

21  medical treatment[.]" *Id*.

22         Here, Defendants have not responded to the evidence that lock downs already occur when

23  CMU inmates leave the CMU for non-religious reasons, such as for medical appointments.

1    Defendants have argued that the entire CERT team would be required to facilitate Plaintiff's

2    access to the sweat lodge, but as discussed *supra*, they have not provided specific evidence on

3    the issue so the court could conclude that Plaintiff accessing the sweat lodge would in fact

4    overwhelm operations at ESP.

5         The compelling reasons test "isn't traditionally the sort of thing that can be satisfied by

6    the government's bare say-so." *Yellowbear*, 741 F.3d at 58-59 (citation omitted). Moreover, the

7    "deference th[e] court must extend to the experience and expertise of prison administrators does

8    not extend so far that prison officials may declare a compelling governmental interest by fiat."

9    *Id*.

10         Finally, Defendants advance the argument that if they grant an exception for Plaintiff, it

11    will open the "flood gates" to other requests for exceptions. The Supreme Court has couched this

12    argument as: "the classic rejoinder of bureaucrats throughout history: If I make an exception for

13    you, I'll have to make one for everybody, so no exceptions." *Gonzales v. O Centro Espirita*

14    *Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006). The Tenth Circuit rejected a similar

15    argument in *Yellowbear*, finding the prison did not identify any evidence "suggesting that there

16    are untold numbers of specially housed prisoners lined up waiting to join Mr. Yellowbear. Or

17    that accommodating them would stretch prison resources too far." *Yellowbear*, 741 F.3d at 62.

18         As the Tenth Circuit explained, this argument misses the whole point of RLUIPA, which

19    "*is to make exceptions* for those sincerely seeking to exercise religion." *Id*. (emphasis original,

20    citation omitted). "[T]he feasibility of requested exceptions usually should be assessed on a

21    'case-by-case' basis, taking each request as it comes: accommodations to avoid substantial

22    burdens must be made until and unless they impinge on a demonstrated compelling interest." *Id*.

23    (citation omitted); *see also Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014) (rejecting this

14

argument based on threadbare conclusion); *Pasaye v. Dzurenda*, 375 F.Supp.3d 1159, 1170 (D. Nev.2 2019) (rejecting argument that if plaintiff was given access to Native American rituals, a flood of other inmates would declare themselves Native American adherents to take advantage of the benefits, as rank speculation).

Here, Defendants have provided no evidence there would be other CMU inmates "lined up" to join Plaintiff in the sweat lodge. In fact, Plaintiff alleges he is the only Native American in the CMU. Nor have Defendants submitted specific evidence that other CMU inmates would seek to practice aspects of their religions outside of the CMU unit. In any event, NDOC's AR 810 itself recognizes any special request is decided on a case-by-case basis taking into consideration factors unique to the specific situation. (ECF No. 47-9 at 5.)

In sum, at this point, Defendants have not sufficiently demonstrated that banning Plaintiff from the sweat lodge is justified by compelling government interests.

**2. Least Restrictive Means**

Even assuming Defendants met their burden of demonstrating the ban on CMU inmates accessing to the sweat lodge is justified by compelling government interests, Defendants have not established the ban is the least restrictive means of furthering these interests.

While prison administrators are "accorded deference with regard to prison security," they must establish they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Greene*, 513 F.3d at 989 (quoting *Warsoldier*, 418 F.3d at 999) (internal quotation marks omitted).

"[I]n light of RLUIPA, no longer can prison officials justify restrictions on religious exercise by simply citing the need to maintain order and security in a prison. RLUIPA requires more." *Id*. at 989-90. Moreover, "RLUIPA does not permit ... unquestioning deference." *Holt,*

574 U.S. at 364; *see also Johnson,* 23 F.4th at 1217. "Instead, 'prison officials *must* set forth detailed evidence, tailored to the situation before the court, that identifies the failings in the alternatives advanced by the prisoner.'" *Johnson*, 23 F.4th at 1217 (emphasis original, quoting *Warsoldier*, 418 F.3d at 1000). "To this end, RLUIPA requires a 'more focused' inquiry that looks at the challenged regulation's application to 'the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Id*. (quoting *Holt*, 574 U.S. at 363). "[T]he government may not satisfy the compelling interest test by pointing to a general interest—it must show the 'marginal interest in enforcing' the [policy at issue against the particular inmate]." *Id*. (citation omitted).

Plaintiff contends there are various reasonable alternatives short of a categorical ban on his ability to access the sweat lodge. First, Plaintiff asserts that he could be subject to the same procedures as other eligible inmates. In addition, if transporting Plaintiff from the CMU to the sweat lodge yard at certain times of the day presents operational difficulties, those could be addressed by scheduling sweat lodge use on particular days or at times less likely to present those issues. Furthermore, Plaintiff points out that current procedures allow up to 14 inmates to use the sweat lodge at a time, and they could reduce that capacity in Plaintiff's case. Similarly, ESP procedures require a chaplain and correctional officer to pass through the sweat lodge at least once an hour, but they could increase that watch if necessary. Instead of considering less restrictive means of furthering any compelling interest, Plaintiff argues that Defendants started and ended with the conclusion that the "policy of no access, ever, represents the least restrictive means."

Defendants maintain the ban on CMU inmates accessing the sweat lodge is the least restrictive means of advancing the compelling safety, security, and operational interests.

Defendants argue the tools and materials required for the sweat lodge cannot be changed without preventing its use altogether. Even if correctional officers could assist in preparation of the sweat lodge, this would remove their focus from safety and security of the institution. Defendants maintain that safety and security concerns make it untenable for a maximum custody death row inmate to be in "no man's land" with materials that can be used as weapons and for escape while the inmate is out of direct supervision.

NDOC did consider having Plaintiff conduct a sweat lodge ceremony in the CMU recreation area. The area is surrounded on three sides by 18-foot-high block walls, has a cement floor and open ceiling. The fourth wall faces the control area with a door for entry and exit. Defendants claim this option is not feasible because the sweat lodge requires an open fire and CMU is in an enclosed space and a fire has not been approved for the area. In addition, the open fire, burning wood, burning rocks, and metal tools can be used as weapons, and other materials could be used for escape in this area as well.

Defendants argument about the inherently dangerous nature of the sweat lodge is subject to the same infirmities discussed above. Chiefly, these concerns exist whether it is Plaintiff accessing the sweat lodge or another convicted murderer housed in the State's maximum-security facility. With respect to the prison yard schedule, Defendants have not presented evidence they considered having Plaintiff access the sweat lodge during any time the yard is not occupied by non-CMU inmates. Nor does it appear Defendants actually contemplated having someone else prepare the sweat lodge (whether the chaplain, correctional staff, or approved volunteers), having Plaintiff attend alone and restrained, or limiting the duration of the ceremony and the number of times Plaintiff is allowed to utilize the sweat lodge throughout the year. Moreover, the fact that Defendants have not ruled out allowing Plaintiff to attend the sweat lodge

1  in the event his execution is imminent suggests that an absolute ban is *not* the least restrictive

2  means of furthering their proffered interests.

3  **3. Conclusion**

4  At this stage, Defendants have failed to demonstrate the ban on Plaintiff's access to the

5  sweat lodge is justified by compelling government interests by the least restrictive means;

6  therefore, the court finds that Plaintiff is likely to succeed on the merits of his RLUIPA claim.

7  **D. Irreparable Injury**

8  Where the plaintiff "raise[s] a colorable claim that the exercise of his religious beliefs has

9  been infringed, he has sufficiently established that he will suffer an irreparable injury absent an

10  injunction[.]" *Warsoldier*, 418 F.3d at 1002. "'[T]he loss of First Amendment freedoms, for even

11  minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the

12  issuance of a preliminary injunction." *Id*. (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

13  The Fifth Circuit has held that "[t]his principle applies with equal force to the violation of

14  RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires

15  courts to construe it broadly to protect religious exercise." *Opulent Life Church v. City of Holly*

16  *Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (citations omitted); *see also Pompilius v.*

17  *Nevada,* No. 2:18-cv-01801-APG-VCF, 2021 WL 414534, at *4 (D. Nev. Feb. 5, 2021); *Pasaye*

18  *v. Dzurenda*, 375 F.Supp.3d 1159, 1170-71 (D. Nev. 2019); *Ross v. Sandoval,* No. 2:17-cv-

19  02386-APG-GWF, 2018 WL 5114134, at *4 (D. Nev. Oct. 19, 2018); *Guardado v. Nevada,* No.

20  2:18-cv-00198-GMN-VCF, 2018 WL 5019377, at * (D. Nev. Oct. 16, 2018).

21  Defendants argue that Plaintiff will not be irreparably harmed because he is able to

22  practice his religious beliefs in all ways except for accessing the sweat lodge, but this is

23

1   immaterial in the context of RLUIPA, and they concede that banning him from the sweat lodge

2   places a substantial burden on his ability to exercise his religion.

3        Defendants further contend the injury is capable of compensation with monetary relief

4   because Plaintiff has requested damages in this action, but this ignores that injunctive relief is the

5   *only* relief available to an inmate asserting a claim under RLUIPA.

6        Plaintiff undoubtedly asserts a colorable claim of infringement on his exercise of his

7   religious beliefs. Therefore, Plaintiff has sufficiently established he will suffer irreparable injury

8   in the absence of injunctive relief.

9   **E. Balance of Equities and Public Interest**

10       Plaintiff contends that the balance of equities weighs in his favor. If injunctive relief is

11  not granted, Plaintiff's rights under the First Amendment and RLUIPA will continue to be

12  infringed. In contrast, Plaintiff asserts the impact on Defendants' interests is limited. Plaintiff

13  also argues the public has an interest in an injunction enforcing his religious rights.

14       Defendants, on the other hand, argue the operational burdens on NDOC if the requested

15  relief is granted are substantial. It would require significant manpower to accommodate a single

16  inmate accessing the sweat lodge for an institution that has limited resources and manpower. In

17  addition, they claim the public's interest is in ensuring correctional staff can maintain safe and

18  secure operations and in carrying out Plaintiff's sentence by housing him in a maximum-security

19  facility in the most restrictive conditions permissible.

20       The court "must balance the competing claims of injury and must consider the effect on

21  each party of the granting or withholding of the requested relief," paying particular attention to

22  the public consequences. *Winter*, 555 U.S. at 24 (citation omitted). Plaintiff's rights will continue

23  to be infringed in the absence of injunctive relief. While Defendants have indicated generally

that the requested relief will impact safety, security, and operations, they have not set forth sufficient evidence to substantiate these concerns. Under these circumstances, the court finds the balance of equities tips in Plaintiff's favor and injunctive relief is in the public interest.

**F. PLRA**

Finally, Plaintiff argues the relief sought is narrowly drawn and satisfies the PLRA because he seeks only an order enjoining Defendants from enforcing their policies against Plaintiff, and the requested injunction extends no further than necessary to remedy the violation of Plaintiff's rights.

Defendants argue the requested relief is not narrowly drawn because Plaintiff asks NDOC to stop enforcing entire provisions of administrative regulations and operational procedures applicable to all institutions and inmates in the State and all inmates within ESP. Defendants also contend the relief would require continuous supervision because the court would be called upon to continuously clarify future contingencies such as when it is acceptable to deny access to the sweat lodge such as when there is an emergency or staffing shortage or due to COVID-19.

The court has concluded that Plaintiff is likely to succeed on the merits of his RLUIPA claim; he is likely to suffer irreparable harm in the absence of injunctive relief; the balance of hardships tip in his favor and an injunction would be in the public interest. Under the PLRA, a preliminary injunction must also be *narrowly* drawn and extend no further than necessary. The court finds that the broad relief requested in Plaintiff's motion does not satisfy the PLRA.

Plaintiff's motion requests that he be allowed to use the sweat lodge in accordance with the current regulations and procedures for sweat lodge use for non-CMU inmates. Under the current regulations and procedures, there can be up to 14 inmates in the sweat lodge at a time, the inmates handle the sweat lodge preparations, and they attend unrestrained. There was testimony

that the ceremonies typically occur at least monthly, and each ceremony lasts for three to four hours.

At the hearing, the court pressed Plaintiff's counsel on the specifics of the relief Plaintiff is seeking, such as how often does Plaintiff wish to access to the sweat lodge, and for how long each time, and under what particular circumstances (i.e., in restraints, preparation done by a volunteer, chaplain or staff, etc.). Plaintiff declined to narrow his request, other than to say he seeks "reasonable" access to the sweat lodge and acknowledged some restrictions might be acceptable without specifically identifying the limits to which he is amenable.

It is recommended that Plaintiff be granted access to the sweat lodge. However, on the record before it, the court cannot conclude that access should be unfettered, and Plaintiff's request, as it stands, is overbroad. The parties should be directed to meet and confer regarding the specifics of that access. If the parties agree, they shall file a stipulation outlining their agreement for the court's approval. If the parties cannot agree, they should alert the court, and the court will determine whether to order supplemental briefing and/or hold a hearing and issue a report and recommendation for the parameters of the injunctive relief.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART** Plaintiff's motion for preliminary injunction insofar as Plaintiff should be granted access to the sweat lodge; however, the parties should be directed to meet and confer regarding the specifics of that access. If the parties reach an agreement, they should be directed to file a stipulation with the court outlining their agreement within **21 days** of the date of any order adopting and accepting this Report and Recommendation for the court's approval. If the parties are unable to reach an agreement, they should be directed to file a notice indicating the same

within **21 days** of the date of any order adopting and accepting this Report and

Recommendation. At that point, the court will determine whether to require supplemental

briefing and/or hold a hearing and issue a report and recommendation for the parameters of the

relief.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

this Report and Recommendation within fourteen days of being served with a copy of the Report

and Recommendation. These objections should be titled "Objections to Magistrate Judge's

Report and Recommendation" and should be accompanied by points and authorities for

consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of

appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

until entry of judgment by the district court.


Dated: August 3, 2022

_____
Craig S. Denney
United States Magistrate Judge